# A single law firm is behind hundreds of website accessibility cases.
# One client says they 'beefed up' her blindness in more than a dozen lawsuits.[1]



[Jack Newsham](#)
Aug. 3, 2021, 7:15 AM

Frances Kalender is going blind. Legally, she already is. She has a condition called retinitis pigmentosa that is eating at her peripheral vision. She can't drive, and some things look blurry, but her central vision still works.

"I can still read, I can still look at the computer," said Kalender, who lives outside New York City. She said she doesn't like [text-to-speech](#) software, like Apple's VoiceOver tool, because the fast, robotic-sounding speech can be hard to understand.

But in 13 lawsuits filed against online retailers last year, her lawyers gave a different impression, saying Kalender couldn't browse the internet without those tools, known as screen readers. They accused the retailers, including the owner of Marc Jacobs Beauty, of breaking the law and demanded thousands of dollars in settlements.

Kalender "requires screen-reading software to read website content using her computer," they wrote in Kalender's legal complaints. She "cannot use a computer without the assistance of screen-reading software," the legal complaints said.

Kalender said she never saw the lawsuits that were filed in her name. When a reporter from Insider read the above sections to her, she seemed confused. "They knew that I could read, they knew that I had vision, that I can see," she said. "They beefed up my blindness."

Website accessibility is a real problem for blind users, and lawsuits can be an effective way for them to get businesses to update their sites. But small businesses, the most common target of such lawsuits, often barely understand what they're being sued for. And payouts from these cases, which can be tens of thousands of dollars, go mostly to the lawyers who file them. Some

---

[1] *Available at* https://www.businessinsider.com/inside-a-disability-lawsuit-factory-blindness-ada-website-accessibility-settlements-2021-7# (last visited August 4, 2021). The article is behind a paywall.

lawyers and serial plaintiffs have created a small cottage industry of these claims, settling for a quick payout and a promise to fix the website.

Kalender was a cog in this lawsuit machine. Over several months in 2020, she was part of a slew of litigation — she reviewed the accessibility of websites, lent her name to lawsuits, and received $500 from each settlement. She said that she didn't know what her lawyers were writing about her and that some of it was false.

**It started with a free laptop**

In early 2020, Kalender saw an advertisement from a Facebook page called I See With My Hands. It calls itself a consumer advocacy organization, and a Facebook ad it's running offers "FREE laptops to the blind or legally blind who would love to be able to use a computer to improve their quality of life." Kalender said she assumed it was a charity.

Kalender filled out an intake form and was soon scheduled to receive her laptop and be trained to use a screen reader at a Manhattan hotel. Around March 8, she took an Uber there and met with two women who worked with the group, she said. As part of the training, she used a screen reader on a list of websites and took notes on which triggered errors.

One of the women said something about putting Kalender in touch with lawyers to help bring websites into compliance with the Americans with Disabilities Act, she said. Later that month, she said, she was introduced to Joseph Mizrahi, who in turn introduced her to another lawyer, Yaakov Saks.

The highest-ranking person at the I See group that Insider could identify is Tina Rogers, a Tennessee woman with a bank-fraud conviction who called herself a volunteer. A contractor who helped set up the group's website and Facebook page said Rogers paid her. Rogers said the group "would be considered a charity," though she acknowledged it wasn't registered as one.

Rogers told Insider she became involved with the group after seeing her father struggle with blindness, but she seemed guarded when asked about other details about the group. She said that the laptops were paid for by "a private entity" and that her expenses were paid by "a private individual that's out of the country." She said the group was not funded by lawyers. She confirmed that she knew Mizrahi but would not elaborate on how.

Mizrahi and Saks file more website-accessibility lawsuits than almost anyone else in the country. A survey by Usablenet, an accessibility-technology company, found that the firms Stein Saks and Cohen & Mizrahi filed a total of 657 website-accessibility cases last year, about a quarter of the nationwide total. Just two days after being introduced to Kalender, Saks' firm was filing lawsuits with her name on them.

Because the law isn't clear about the standards businesses must meet online, attorneys say, most businesses are willing to pay — typically $5,000 to $20,000 — just to make web-accessibility lawsuits go away. Most cases are settled within a couple of months because it's much cheaper to pay than to fight.

Fergus Hernandez, an executive at a makeup company, said he was stunned when Kalender's lawyer sent his company a threatening letter last year, on her behalf, about the accessibility of its website.

"We thought, 'OK, this kind of feels fake,'" he said.

He received more documents and realized the legal risk was real. He said Kalender's lawyer demanded $15,000, which his lawyers argued down to about $9,000. Negotiations were "very short," with "lots of yelling involved from the people seeking the funds," Hernandez said.



**Frances Kalender checks her email on the free laptop given to her by I See With My Hands.** Joshua Matthews for Insider

## The ADA's promise

Title III of the Americans with Disabilities Act allows disabled people to sue "places of public accommodation" like movie theaters, hotels, and retailers that discriminate against them. But it doesn't mention the internet, which barely existed when the law was enacted in 1990. Courts have been mixed on whether the law covers websites and apps.

David Ferleger, a longtime disability-rights lawyer, said Congress worked a compromise into the law: People with disabilities can recover damages from government agencies and employers that discriminate against them, but they can't win damages in public-accommodations cases. In those cases, he said, they can win payment only of their legal fees.

"That compromise gives lawyers an incentive to file these 'click-by' cases," Ferleger said, using a play on the term "drive-by" lawsuit, coined to describe the practice of driving by a location to assess whether it seemed wheelchair-accessible and filing a lawsuit on that basis.

Digital accessibility is a real problem. Shopping, job applications, and even medical care have moved online, but pop-ups, broken links, and images without text descriptions can make it difficult for blind users and people with other disabilities, like severe dyslexia, to navigate the web. Many website owners install "accessibility overlays" to try to fix the problem, but blind internet users say they often don't work.

ADA lawsuits over websites have skyrocketed, from just 57 in 2015 to more than 2,500 cases filed last year, according to the law firm Seyfarth Shaw. But the wave of lawsuits doesn't seem to have had much impact on accessibility; in the most recent survey of screen reader users by the group WebAIM, just 39% of users said online accessibility has improved in the past year, a number that has changed little in nine surveys taken since 2009.

Some digital accessibility lawsuits have been brought by high-profile groups like the National Federation of the Blind and the Equal Rights Center and led to landmark settlements, with big companies pledging to fix their websites. The Justice Department and lawyers like Ferleger and Lainey Feingold have leveraged the ADA to get brands like Peapod, Bank of America, and Major League Baseball to code their apps and websites using a comprehensive set of standards called the Web Content Accessibility Guidelines.

But small-potatoes cases are the norm.

**Quantity over quality?**

For some of the lawyers who file website-accessibility lawsuits, it seems to be a numbers game. Valerie Ferrier, a lawyer at Kane Kessler who has represented businesses in such suits, said she'd seen complaints use gender pronouns that don't match the plaintiff. They read as if they were copied and pasted, she said.

That seems to be what happened with Kalender's lawsuit against Southern Tide LLC, which sells preppy clothing and other merchandise. On March 8, Kalender sent an email flagging issues with Southern Tide's website to one of the women who trained her. "My account link didn't tell you it was there ... had a pop-up & can't escape & combo boxes don't drop down," she wrote. Less than two weeks later, and just two days after an introductory phone call with Saks, Kalender sued the company.

But the lawsuit filed against Southern Tide on March 20 didn't mention pop-ups, a "my account" link, or combo boxes. Instead, it mentioned a host of issues that Kalender hadn't raised in her email. The complaint, signed by one of Saks' colleagues, said that label elements were missing and that "many pages on the Website also contain the same title elements." The suit also said that "many features on the Website lacks alt. text."

The complaint also misstated where Kalender lived (it said Brooklyn, New York, where Kalender said she'd never resided) and when she last visited southerntide.com (it said January 2020, two months before Kalender emailed I See With My Hands about it).

Kalender believes that Saks, Mizrahi, and the I See group were aware, or should have been aware, that she didn't need a screen reader. She said the people who trained her knew that she could see, and she'd told Mizrahi and Saks over the phone that she had vision.

"This is what I tell everybody: I am legally blind … However, I still have my vision, and I have an eye disorder called retinitis pigmentosa," Kalender said. "There are many different forms of eye diseases that leave people in various ways of seeing or not seeing. Don't you think they should have looked up on it?"

When she described her condition, she said, nobody seemed surprised or concerned. Saks just told her to email him when she found a website, she said.

Rebecca Roiphe, a professor at New York Law School, said a distortion of disability in a legal complaint in the way Kalender described would be troubling.

"From the perspective of a legal ethicist, this is extremely problematic," she said. "This doesn't seem like some peripheral fact — this is a key, important, perhaps the most important fact." The Southern Tide case was settled for $6,000. That sum covered legal fees and $500 for Kalender.

Told by Insider that one of his clients was not actually reliant on a screen reader, Mizrahi expressed concern and said it was generally his practice to get a letter attesting to a client's impairment. Kalender said she did not recall sharing any such letter.

"Wow, that's news to me," he said. "What I can say is in the complaints — again, without looking at anything further, on the fly — it talked about 'blind or legally blind.' There's always a sight impairment."

After Insider shared details of its reporting, Mizrahi said in an email that his firm "obtained Ms. Kalender's express assurance that she had a qualifying disability, as we do in every other ADA case."

Saks didn't respond to numerous calls or emails describing Insider's findings and requesting an interview.

Kalender said that while she was paid a few times in 2020 for different lawsuits, she wasn't in it for the money. She said she wanted to promote accessibility online, and if her lawyers used her as "a vessel," she was fine with that.

Kalender said that it was possible she'd be fully blind one day and that she wanted to be prepared, which is why she learned to use a screen reader. She said she'd even work with the same lawyers again, if she were assured that most of the proceeds they collected would go to charities that help blind and disabled people.

"Was it nice to receive a few checks, sure!" she wrote in an email to Insider. "But even if I didn't I would have still contributed; after all, I did receive a free laptop with a screen reader in it."

###